[No. B050535. Second Dist., Div. One. Apr. 26, 1991.]

DAVID C. ANDERSON, Plaintiff and Appellant, v.
LOS ANGELES COUNTY EMPLOYEE RELATIONS
COMMISSION, Defendant and Respondent;
PROFESSIONAL PEACE OFFICERS' ASSOCIATION, Real Party
in Interest and Respondent.

818

COUNSEL

Silver, Goldwasser & Shaeffer and Stephen H. Silver for Plaintiff and Appellant.

No appearance for Defendant and Respondent.

Marr & Marchant, Cecil Marr and Diane Marchant for Real Party in Interest and Respondent.

OPINION

**ORTEGA, J.**—In this case of first impression, we must decide whether it is an unfair labor practice under the Meyers-Milias-Brown Act (Gov. Code, § 3500 et seq., hereinafter the MMBA) and Los Angeles County Employee Relations Ordinance 9646 (hereinafter County Ordinance), for an employee organization to deny reinstatement to a former member who was expelled for dual unionism. We conclude the MMBA and the County Ordinance do not preclude a union from defending itself in this manner, and that the union's action in this case was reasonable. We affirm the judgment denying the petition for writ of mandate.

FACTS

The facts were stipulated. Petitioner David C. Anderson has been a sergeant in the Los Angeles County Sheriff's Department since 1984.[1] As a sheriff sergeant, Anderson is a member of Los Angeles County Bargaining Unit No. 612, which is comprised of supervisory peace officers in the classifications of "Sheriff Sergeant, Sheriff Lieutenant, Lieutenant (District Attorney), and Supervising Investigator (District Attorney)."

Real party in interest, Professional Peace Officers' Association (hereinafter PPOA), is the certified majority bargaining representative for unit Nos.

---

[1] Prior to his promotion to sergeant, Anderson was a director of ALADS, which is the exclusive bargaining agent for sheriff's deputies.

612 and 621. Unit No. 621 is comprised of all employees in the classifications of "Corrections Officers and Custody Assistants." PPOA's voting membership also includes many employees who do not belong to either unit No. 612 or No. 621.

Anderson joined PPOA upon being promoted to sheriff sergeant in 1984.[2] Anderson became a PPOA delegate from the Industry Station of the Los Angeles County Sheriff's Department, and served as PPOA's spokesman to his worksite.

While serving as a PPOA delegate in 1986, Anderson became an organizer of a rival union, the Lieutenants and Sergeants Organization (hereinafter LASO), which was formed with the purpose of replacing PPOA as the majority bargaining representative for unit No. 612. On March 5, 1986, LASO became registered as an employee organization with respondent Los Angeles County Employee Relations Commission (hereinafter ERCOM).

On March 12, 1986, three members of the PPOA Board of Directors (hereinafter PPOA Board) presented written charges to initiate removal proceedings against Anderson and Michael Allen, based on their involvement "in establishing a competing association whose objectives are to 'represent supervisors in dealing with their employer concerning grievances, labor disputes, wages, rates of pay, hours, and other terms and conditions of employment.'" The written charges further alleged that their conduct was "inimical to the well being of [PPOA]."

These charges against Anderson and Allen were brought pursuant to article VI, section 1 of PPOA's bylaws, which requires three PPOA Board members to file written charges to initiate removal proceedings against any PPOA member. Article VI, section 1, subdivision (A) of PPOA's bylaws permits the PPOA Board by a two-thirds majority vote "to remove any regular member . . . who becomes negligent in the performance of his duties or guilty of any acts inimical to the welfare of [PPOA]."

Anderson received written notice of these charges and of his right to respond as required by article VI, section 1, subdivision (C) of PPOA's bylaws. Anderson appeared at the April 9, 1986, PPOA Board meeting, and

[2] Article III, section 3 of PPOA's bylaws (as amended to Nov. 1985) provides: "Application for membership in this Association shall be filed within three hundred sixty-five days of the date of applicant's permanent appointment to the position as outlined in Section 2 of this article. Any employee making application for membership after the three hundred sixty-five day period shall have his application submitted to, and approved by, the Board of Directors of this Association; a majority vote of said Board of Directors shall either confirm or deny such application for membership."

read a prepared statement. The PPOA Board, by unanimous vote with one abstention, voted to terminate Anderson's PPOA membership effective April 15, 1986. The PPOA Board specifically found that Anderson had "been involved in establishing LASO, a competing association whose objectives are to represent supervisors of Unit 612 with respect to their terms and conditions of employment," and that such involvement "constituted acts inimical to the welfare of [PPOA] in violation of Article VI, Section 1 (A)."

Anderson received written notice of the PPOA Board's decision, and he never challenged the termination of his PPOA membership.

In 1987, Anderson became president of LASO and led a decertification campaign on behalf of LASO against PPOA. On November 2, 1987, Anderson, as president of LASO, signed a decertification petition which alleged that PPOA was "no longer the majority representative of the employees in [Unit No. 612]." The decertification petition complied with the rules and regulations promulgated by ERCOM under the authority of the County Ordinance and the MMBA.

The unsuccessful decertification election was held in November 1987, two months before the memorandum of understanding between PPOA and the county was to expire on January 31, 1988. ERCOM certified the election results on November 18, 1987, and PPOA remained the certified majority bargaining representative of unit No. 612.

On April 4, 1988, the members of LASO voted to dissolve their organization. Soon thereafter, Anderson applied to be reinstated as a member of PPOA. Pursuant to article III, section 3 of PPOA's bylaws, approval of Anderson's application (which was outside the initial 365-day period following his promotion) required a majority vote of approval by the PPOA Board. On April 13, 1988, however, the board voted unanimously to deny Anderson's application.

In response to Anderson's written protest and request to be informed of PPOA's administrative review process, PPOA's president invited Anderson to attend the next PPOA Board meeting and request reconsideration of his application. Anderson attended the July 13, 1988, PPOA Board meeting, and presented his statement.[3] But no PPOA Board member moved to

---

[3] According to the July 13, 1988, PPOA Board meeting minutes, Anderson contended the PPOA Board's refusal to reinstate him was an unfair labor practice and that he would consider taking legal action against PPOA. Anderson also "expressed the opinion the Board was afraid he would run for a seat, and while he did not think one vote could ever have much effect due to the size of PPOA's Board, if the membership decided to elect him to office,

reconsider Anderson's application, and Anderson was notified that the matter was deemed to be closed.

On July 15, 1988, Anderson wrote a letter to PPOA's president protesting the denial of his application. Anderson maintained that his " 'disloyal' act to PPOA was an exercise [of his] right to free speech," and that he is and has always been, "loyal to [his] bargaining unit." Anderson wrote that he was denied reinstatement because he "exercised [his] rights, looked at PPOA's books, and then told other supervisors of PPOA's mismanagement of . . . dues."

On August 3, 1988, Anderson filed an unfair labor practice charge with ERCOM. Anderson claimed PPOA's refusal to reinstate him as a member prevented him from "obtaining proper assistance with grievances and arbitrations or with civil service in the event of a suspension, reduction or discharge" and "from seeking office in his bargaining unit, serving on the negotiations committee, or even voting on the M[emorandum] O[f] U[nderstanding] that will determine his wages, hours, and working conditions." Anderson also alleged that PPOA's refusal to reinstate him violated sections 4 and 12 (b)(1) of the County Ordinance, by interfering and restraining him in his right to join and participate in the activities of his employee organization.[4]

The administrative hearing was held on January 17, 1989, before Hearing Officer Michael Prihar. The matter was tried on the above facts. On May 19, 1989, Prihar submitted a 19-page, single-spaced report to ERCOM in which he analyzed Anderson's claims in great detail and concluded that PPOA had not violated sections 4 and 12 (b)(1) of the County Ordinance. Prihar found that PPOA was justified in its initial uncontested decision to expel Anderson for "dual unionism and/or efforts to decertify a union as the bargaining agent . . . ." Prihar further stated: "Although no reason

th[e]n 'that was what this organization had coming.' He went on to say that membership rights included the right to run for office, and LASO was a dead issue, however, he was willing to discuss it . . . ."

[4] Section 4 of the County Ordinance provides: "Employees of the County shall have the right to form, join and participate in the activities of employee organizations of their own choosing for the purpose of representation on all matters of employee relations. Employees of the County also shall have the right to refuse to join or participate in the activities of employee organizations and shall have the right to represent themselves individually in their employment relations with the County. No employee shall be interfered with, intimidated, restrained, coerced or discriminated against because of his exercise of these rights."

Section 12 (b)(1) of the County Ordinance provides: "It shall be an unfair employee relations practice for employee organizations or their representatives or members: [¶] (1) To interfere with, restrain or coerce employees in the exercise of the rights recognized or granted in this Ordinance."

was given by [PPOA] in its communication with Anderson regarding the denial for reinstatement, the parties' arguments reflect agreement that it was the same reasons involved in his loss of membership."

Prihar rejected Anderson's assertion that because PPOA had implemented many of LASO's goals, this proved his motivation to improve the service provided to unit No. 612 members was sincere. Prihar was not persuaded by this purported justification, and stated in his report: "As previously noted, Anderson did not undertake a comprehensive effort to bring about these reforms within the structure of PPOA. He created a competitive entity."

Prihar also dismissed Anderson's contention that he no longer posed a threat to PPOA because he was no longer involved in a competing organization. Prihar stated: "The Board in *Tawas* [*Tube Products, Inc.* v. *United Steelworkers of America* (1965) 151 N.L.R.B. 46], as well as the courts in [*N.L.R.B.* v.] *International Molders* [& *Allied W. U., Loc. No. 125* (7th Cir. 1971) 442 F.2d 92] and *Price* [v. *N.L.R.B.* (9th Cir. 1967) 373 F.2d 443] recognized the potential for conflict and continuous problems if such an antagonist was allowed to remain in the union and be privy to union tactics and strategy. This very issue exists in the present case as evidenced in Anderson's reference to financial information otherwise available to PPOA members . . . . As noted also by PPOA, Anderson admitted his use of such information . . . . PPOA and its Board would reasonably feel constrained to carry out its functions in a normal environment were it forced to re-admit Anderson. It is therefore concluded the denial of reinstatement based on reasons justifying the initial expulsion and Anderson's subsequent efforts to decertify the Association is not a violation of the Ordinance."

ERCOM adopted Prihar's recommendation and dismissed Anderson's unfair labor practices charge. Anderson filed a timely petition for writ of mandate. (Code Civ. Proc., §§ 1094.5, 1094.6.) Anderson asked the court to issue a peremptory writ of mandate commanding ERCOM to set aside its decision that PPOA had not committed an unfair labor practice by refusing to reinstate him. Anderson sought an order requiring PPOA to grant him membership, permit him to hold office, allow him to participate in negotiations, allow him to vote, grant him the right to have representation in disciplinary proceedings, and pay his costs and attorneys' fees in this action.

The trial court denied Anderson's petition on April 16, 1990. The minute order stated in relevant part: "[ERCOM] did not abuse its discretion. In cases of this type the rights of individual members must be balanced against the right of the union to govern itself. [Citation.] The hearing officer's characterizations of [Anderson's] actions against [PPOA] as 'a threat to its

existence[,'] and as 'patently antagonistic to the continued existence of the union as a collective bargaining agent[,]' are supported by substantial evidence and make the decision to deny reinstatement 'manifestly reasonable' [citation]."

The trial court entered judgment on April 27, 1990, and this timely appeal followed.

## ISSUES

Anderson contends (I) the judgment violates the MMBA and the County Ordinance; (II) the judgment has a chilling effect upon his statutory right to form a competing organization and assist that entity's decertification efforts; and (III) he is entitled to attorney's fees for enforcing an important right affecting the public interest (Code Civ. Proc., § 1021.5).

## DISCUSSION

### I

Anderson contends that the judgment violates Government Code sections 3502 and 3506 and sections 4 and 12 (b)(1) of the County Ordinance by permitting PPOA to discriminate against him for his lawful participation in LASO's activities. Anderson asserts that section 3503 of the Government Code, which permits employee organizations to adopt reasonable membership restrictions, does not permit PPOA to deny his application on the ground of dual unionism. We find, however, that the MMBA and the County Ordinance permit employee organizations to defend themselves against those who have engaged in dual unionism by suspending or excluding them from membership.[5]

The MMBA was enacted in 1961 "in order to improve employer-employee relations in public agencies throughout the state by providing a uniform basis for recognizing the right of public employees to join organizations in their employment relations. [Citations.] The act grants to public employees 'the right to form, join and participate in the activities of employee

---

[5] At oral argument, Anderson contended he is the victim of a "lifetime" ban from PPOA membership. Nothing in the record supports the "lifetime" ban characterization. This opinion considers only the circumstances that existed at the time of the PPOA Board's April 13, 1988, denial of Anderson's reinstatement application and the PPOA Board's subsequent denial of Anderson's July 13, 1988, request for reconsideration. Nothing in this opinion is intended to preclude Anderson from reapplying for PPOA membership at some future date based on a change in circumstances.

organizations of their own choosing.' (Gov. Code, § 3502.) . . . For the protection of the employees in the exercise of the rights granted, the Legislature directed that 'Public agencies and employee organizations shall not interfere with, intimidate, restrain, coerce or discriminate against public employees because of their exercise of their rights under section 3502.' (§ 3506, Gov. Code.)" (*Ball* v. *City Council* (1967) 252 Cal.App.2d 136, 142 [60 Cal.Rptr. 139], fn. omitted.)

Although the MMBA was designed to protect public employees in the exercise of their rights under the act, the MMBA also provides that "[e]mployee organizations may establish reasonable restrictions regarding who may join and may make reasonable provisions for the dismissal of individuals from membership . . . ." (Gov. Code, § 3503.)

Accordingly, the rights and protections granted to employees under sections 3502 and 3506, and under the similarly worded provisions of County Ordinance sections 4 and 12 (b)(1), must be read in conjunction with the union's countervailing right under Government Code section 3503 to impose reasonable membership restrictions.[6]

Anderson contends, however, that PPOA failed to adopt any written membership restrictions other than to require approval by the majority of the PPOA Board when an application is filed after the initial 365-day period. Anderson claims this majority vote provision is not an identifiable restriction regarding who may join PPOA, and simply gives "carte blanche authority to its Directors to deny membership without having to supply any supporting reason." Anderson thus contends PPOA cannot defend its denial of his reinstatement application by citing Government Code section 3503.

Anderson's contention has some logic, but bears no relation to the facts of this case. Although this appeal does not directly arise from Anderson's April 1986 expulsion from PPOA, which he never challenged, the record supports the trial court's determination that the denial of Anderson's reinstatement application two years later was based on the same grounds as his expulsion.[7] His expulsion was clearly justified by his efforts to organize a

---

[6]The County Ordinance was adopted pursuant to section 3507 of the Government Code, which permits a public agency to adopt "reasonable rules and regulations after consultation in good faith with representatives of an employee organization or organizations for the administration of employer-employee relations under [the MMBA]." The public agency's regulations must therefore be consistent with the MMBA. The fact that County Ordinance sections 4 and 12 (b)(1) must be harmonized with section 3503 is also reflected by the Ordinance itself, which states at section 17 that its provisions are not intended to conflict with the provisions of the MMBA.

[7]The trial court responded to Anderson's contention that PPOA had failed to establish membership guidelines as follows: "Somewhat more difficult is the question of whether a

rival union and to decertify PPOA, which are certainly acts inimical to the welfare of PPOA in violation of article VI, section 1 (A) of PPOA's bylaws. Anderson cannot seriously contend that he came with a clean slate before the PPOA Board when only four months earlier he was leading the battle to decertify PPOA and make LASO the new majority bargaining representative of his unit. Accordingly, it is appropriate and necessary to discuss the April 1986 expulsion decision.

■ In reviewing the "expulsion of a member from a voluntary unincorporated association, the only function which the courts may perform is to determine whether the association has acted within its powers in good faith, in accordance with its laws and the law of the land. [Citations.]" (*Smith* v. *Kern County Medical Assn.* (1942) 19 Cal.2d 263, 265 [120 P.2d 874].) "An organization has the natural right of self preservation, and may with propriety expel members who show their disloyalty by joining a rival organization. [Citations.]" (*Davis* v. *Int. Alliance etc. Employees* (1943) 60 Cal.App.2d 713, 715 [141 P.2d 486].) The sole question in such a case is whether the disloyal members were tried and expelled in accordance with the constitution and bylaws of the association. (*Id.* at pp. 715-716.)

■ There is no question concerning the propriety of the procedures followed by PPOA in this case. When a disloyal member is expelled for his considerable efforts to form a rival union and later becomes its president and urges his fellow workers to vote to decertify the union in favor of his rival union, and then applies for readmission only four months after the unsuccessful decertification election and only days after disbanding the rival union, the denial of his reinstatement application by a unanimous vote of the board of directors is entirely reasonable. (*Mitchell* v. *Internat. Assn. of Machinists* (1961) 196 Cal.App.2d 796, 801 [16 Cal.Rptr. 813].) In the "'treason' cases in which an individual's acts are patently antagonistic to the continued existence of the union as a collective bargaining agent[,] . . . [t]he courts lose no time in such cases upholding union discipline." (*Ibid.*)

Anderson's claim that he no longer posed a threat to the existence of PPOA when he applied for readmission is certainly subject to dispute. The

restriction to the effect that an application for membership must be approved by a majority of the directors of the employee organization, is *per se* reasonable. [¶] It is not necessary to resolve that issue in this matter because it is undisputed that petitioner was denied membership in [PPOA] because he had previously been expelled from the employee organization for organizing a rival organization and had not protested against his expulsion; but when the rival organization lost an election to displace [PPOA] as bargaining agent for a substantial portion of [PPOA's] members, Petitioner's request for reinstatement as a member of [PPOA] was denied. The hearing officer held that it was reasonable for [PPOA] to deny reinstatement under such circumstances and [ERCOM] adopted his decision. [¶] [ERCOM] did not abuse its discretion . . . ."

statements Anderson made at the July 13, 1988, PPOA Board meeting and in his July 15, 1988, letter to PPOA's president, were interpreted by the hearing officer as evidence that Anderson posed a continuing threat to the stability and well-being of the union. This interpretation of Anderson's statements was not unreasonable, and the trial court was justified in finding the interpretation was supported by substantial evidence. We find no abuse of discretion.

While Anderson has lost many advantages by being denied reinstatement in the organization which has been granted majority representative status (see, e.g., *Directors Guild of America, Inc.* v. *Superior Court* (1966) 64 Cal.2d 42, 52-53 [48 Cal.Rptr. 710, 409 P.2d 934]; *Mitchell* v. *Internat. Assn. of Machinists, supra,* 196 Cal.App.2d at pp. 799-800), we conclude the denial of reinstatement was not an unfair labor practice under the MMBA or the County Ordinance. "The union's power, when considered together with its source, imposes upon it reciprocal responsibilities toward its membership and the public generally that other voluntary organizations do not bear. [Citations.]" (*Mitchell* v. *Internat. Assn. of Machinists, supra,* 196 Cal.App.2d at p. 799.) One of the primary obligations of the membership is not to seek the very destruction of the union by engaging in dual unionism.

Our conclusion is supported by federal decisions interpreting similar provisions of the National Labor Relations Act (NLRA). ■ (See *Fire Fighters Union* v. *City of Vallejo* (1974) 12 Cal.3d 608, 616 [116 Cal.Rptr. 507, 526 P.2d 971] ["In the past we have frequently referred to such federal precedent in interpreting parallel language in state labor legislation."]; *Andrews* v. *Board of Supervisors* (1982) 134 Cal.App.3d 274, 283 [184 Cal.Rptr. 542] ["Where the language of the NLRA parallels that of the MMB Act, the NLRA precedents will be used to interpret the MMB Act. [Citation.]"].)

*Price* v. *N.L.R.B.* (9th Cir. 1967) 373 F.2d 443, is analogous to this case. Price, like Anderson, led an unsuccessful decertification campaign against his own union. The union charged Price with violating article XII, section 1(d) of its constitution which prohibited members from "'. . . advocating or attempting to bring about the withdrawal from the International Union of any Local Union or any member or group of members . . . .'" (*Id.* at p. 445.) The union constitution further provided that any member convicted of this offense could be fined, suspended, or expelled. Price was tried, convicted and suspended for five years. He then filed an unfair labor practices charge with the National Labor Relations Board. (Like Anderson, Price continued in his employment despite his suspension from the union.) The

Board found that the suspension did not violate section 8(b)(1)(A) of the NLRA as amended (29 U.S.C. § 158(b)(1)(A)).[8]

In denying Price's petition, the Ninth Circuit panel distinguished Price's situation from those where "the union member was not attacking the union's existence or its position as bargaining agent vis-á-vis a particular employer." (*Price* v. *N.L.R.B.*, *supra*, 373 F.2d at p. 446.) The court pointed out that Price "did not accuse the union of violating any provision of law. He sought to attack the union's position as bargaining agent, which is, as the Board says, in a very real sense an attack on the very existence of the union. We think that, at the least, the proviso [in section 8(b)(1)(A) of the NLRA (29 U.S.C. § 158(b)(1)(A))] was intended to permit the union to suspend or expel a member who takes such a position. Otherwise, during the pre-election campaign, the member could campaign against the union while remaining a member and therefore privy to the union's strategy and tactics. We can see no policy reason for requiring the union to retain a member who takes such a position. See Tawas Tube Products, Inc. and Harold Lohr and United Steelworkers, 151 NLRB 46 (1965). [¶] We express no opinion as to whether, if the discipline had been more severe, the result should be different." (*Price* v. *N.L.R.B.*, *supra*, 373 F.2d at p. 447.)[9]

Although as Anderson points out, the "proviso" (granting the union the right to adopt its own membership rules) in section 8(b)(1)(A) of the NLRA (29 U.S.C. § 158(b)(1)(A)) is part of the same sentence which forbids unions from restraining or coercing employees in the exercise of their rights under

---

[8] " '(b) It shall be an unfair labor practice for a labor organization or its agents—(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7: *Provided*, That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; * * * .'
"Section 7 provides:
" 'Sec. 7. Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a) (3).' " (*Price* v. *N.L.R.B.*, *supra*, 373 F.2d at p. 444, fn. 1.)

[9] See also *N.L.R.B.* v. *International Molders & Allied W. U., Loc. No. 125* (7th Cir. 1971) 442 F.2d 92, 94 ("[I]t has been held that a union may expel a member for bringing a petition for its decertification before the Board under § 9 of the [NLRA]. [Citations.] These cases explain that the filing of a petition for decertification, unlike the filing of an unfair labor practice charge under § 8, attacks the very existence of the union as the exclusive bargaining agent. In light of this threat, the proviso to § 8(b)(1)(A) justifies a defensive reaction by the union such as expulsion of a member who has filed a petition for decertification with the Board. Otherwise, these cases explain, a retained member would be privy to the union's tactics and other information during the pre-election campaign. Expulsion eliminates the presence of an antagonistic member whose disloyalty would pose such problems to the union.")

section 7 of the NLRA, we do not think this distinction makes *Price* inapplicable to this case. We concede that the MMBA, unlike the NLRA, does not combine the language of Government Code sections 3506 and 3503 into one sentence. But we believe Government Code sections 3502, 3503 and 3506 must be read together and harmonized.

Anderson also contends that section 8(b)(1)(A) of the NLRA (29 U.S.C. § 158(b)(1)(A)) is distinguishable from Government Code section 3503 of the MMBA because section 8(b)(1)(A) does not state that the union's membership restrictions must be "reasonable." This purported distinction also fails to withstand scrutiny. For example, even in the absence of statute, the courts have the power to strike down any union membership restrictions that discriminate on the basis of race. (*Williams v. Int. etc. of Boilermakers* (1946) 27 Cal.2d 586, 589-590 [165 P.2d 903].) We therefore reject Anderson's contention that the decisions interpreting section 8(b)(1)(A) of the NLRA must not be followed.[10]

The cases cited by Anderson to support his claim that PPOA unreasonably denied him membership are distinguishable. (*Directors Guild of America, Inc. v. Superior Court, supra,* 64 Cal.2d 42; *James v. Marinship Corp.* (1944) 25 Cal.2d 721 [155 P.2d 329, 160 A.L.R. 900]; *Ball v. City Council, supra,* 252 Cal.App.2d 136.) The *Directors Guild* decision dealt with a federal preemption issue; there was no allegation of an unfair labor practice based on the union's decision to discipline a member for dual unionism. The *James* decision held that a union which maintained a closed shop agreement with the employer could not also maintain an arbitrarily closed or partially closed union that excluded Blacks. The *Ball* decision held that a chief of police was improperly dismissed from employment because he exercised his statutory right under Government Code section 3502 to join and participate in the activities of an employee organization.

We conclude that the findings of the trial court are supported by substantial evidence. (See *Bullock v. Sweeney* (N.D.Cal. 1986) 644 F.Supp. 507, 509 ("The mere application for membership, which is subject to approval as

[10] Anderson's reliance on *Service Employees Internat. Union v. City of Santa Barbara* (1981) 125 Cal.App.3d 459, 466-467 [178 Cal.Rptr. 89] (hereinafter *SEIU*), is misplaced. In *SEIU*, which was decided by this division, we noted that while the National Labor Relations Board had developed a "three-year 'contract bar' doctrine" (*id.* at p. 466), the "MMBA is silent on the subject of the contract bar doctrine." (*Ibid.*) We further noted that even though the California Legislature has adopted the contract bar in various statutes regulating public employer-employee labor relations passed since 1975, thus reflecting a growing legislative acceptance of the doctrine, "we cannot assume the existence of an intent that finds no expression in the words of the statute. [Citation.]" (*Id.* at p. 467.) In this case, of course, section 3503 of the Government Code explicitly provides unions with the right to develop their own reasonable membership restrictions, and we are therefore not improperly assuming the existence of an intent that finds no expression in the words of the statute.

prescribed by the Unions' constitution, does not constitute membership or result in any vested right. [Citation.]").)

## II

Anderson contends the judgment has a chilling effect upon his statutory right to form a competing organization and assist that entity's decertification efforts. In support of this contention, Anderson cites *Sheet Metal Workers* v. *Lynn* (1989) 488 U.S. 347 [102 L.Ed.2d 700, 109 S.Ct. 639]. *Sheet Metal* is distinguishable however, because it involved an elected union business representative who was removed from his position by the union trustee because of his outspoken opposition to the trustee's proposed union dues increase. The United States Supreme Court concluded that his removal, in retaliation for statements he made at a union meeting in opposition to a dues increase sought by the union trustee, violated title I of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 411(a)(2) (hereinafter, LMRDA). There was no issue of dual unionism.

Moreover, a reading of the relevant section of section 101(a)(2) of the LMRDA (29 U.S.C. § 411(a)(2)), which is cited in *Sheet Metal*, reveals that Congress has specifically permitted labor unions to enforce reasonable rules restraining members from interfering with the union's performance of its legal or contractual obligations.[11] A union member's free speech rights under section 101(a)(2) are not violated when he is disciplined for establishing a rival union, becoming one of its leaders and promoting it, and interfering directly with the union's efforts to function as an institution. (*Ferguson* v. *Intern. Ass'n of Bridge, Etc., Wkrs.* (9th Cir. 1988) 854 F.2d 1169, 1175 ("We hold that appellants' conduct—dual unionism and the speech incident thereto—is subject to reasonable discipline under section 101(a)(2) . . . . We agree with the district court that the suspensions and expulsion were reasonable . . . ."); cf. *Farnum* v. *Kurtz* (1969) 2 Cal.App.3d Supp. 1, 3-4 [81 Cal.Rptr. 924].)

---

[11] Section 101(a)(2) of the LMRDA, titled "Freedom of Speech and Assembly," provides in relevant part: "Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views . . . upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of the meetings: *Provided*, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations." (Italics added.)

## III

In view of the above, we need not address Anderson's claim for costs and fees.

### DISPOSITION

We affirm the judgment.

Spencer, P. J., and Devich, J., concurred.

Appellant's petition for review by the Supreme Court was denied July 11, 1991.