615 F.2d 728
 103 L.R.R.M. (BNA) 2707, 88 Lab.Cas. P 11,890
 MADEIRA NURSING CENTER, INC., Plaintiff-Appellant,
v.
NATIONAL LABOR RELATIONS BOARD, REGION NO. 9; Emil C.
Farkas, Regional Director, National Labor Relations Board,
Region No 9; and John S. Irving, General Counsel, National
Labor Relations Board, Defendants-Appellees.
 No. 77-3370.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 17, 1979.
Decided Feb. 25, 1980.
 
 Louis J. Finkelmeier, Finkelmeier & Finkelmeier, Cincinnati, Ohio, Kenneth R. Gilberg, Pechner, Dorfman, Wolffe, Rounick & Cabot, Julius M. Steiner, Allan M. Dabrow, Philadelphia, Pa., for plaintiff-appellant.
 Earl L. Ledford, Atty., Cincinnati, Ohio, John S. Irving, Gen. Counsel, Kenneth R. Hipp, Anne H. Andrews, Ruah Lahey, N. L. R. B., Washington, D. C., for defendants-appellees.
 Before ENGEL, MARTIN and JONES, Circuit Judges.
 BOYCE F. MARTIN, Jr., Circuit Judge.
 
 
 1
 Plaintiff-appellant, Madeira Nursing Center, Inc., seeks an order directing the National Labor Relations Board to produce certain documents relevant to a union representation election. Specifically, Madeira claims that the Freedom of Information Act (the "Act"), 5 U.S.C. § 552, permits an employer to obtain copies of (a) authorization cards signed by employees who wish union representation and (b) documents pertaining to the Board's preliminary "showing of interest" investigation.
 
 
 2
 Madeira operates a 98-bed nursing home in Madeira, Ohio. On November 26, 1976, the Communication Workers of America, AFL-CIO ("the Union"), filed a petition which asked the Board to conduct a representation election. In accordance with Board procedure, the petition alleged that at least 30 percent of Madeira's employees desired Union representation. To demonstrate this "showing of interest," the Union offered authorization cards signed by Madeira employees.
 
 
 3
 The Board sent an agent to investigate the petition. After examining the authorization cards, the agent completed and filed Form 4069, a statistical compilation which analyzed the validity of the cards without revealing the voting preferences of individual employees. The agent also submitted a memorandum report which did disclose the identities of employees who had signed authorization cards.
 
 
 4
 On December 4, 1976, Madeira informed the Board that it questioned the Union's claim of a 30 percent showing of interest. Emil C. Farkas, Director of NLRB Region 9, scheduled a hearing on the issues raised by the representation petition.
 
 
 5
 Madeira made a written request to examine the authorization cards, acknowledging its intent to attack the validity of the signatures. Pursuant to the Act, it also sought all documents reflecting the Board's "showing of interest" investigation. Director Farkas responded by asserting that the Act exempted the requested items from disclosure.
 
 
 6
 On January 11, 1977, Madeira brought an action in federal district court to compel the Board to produce the authorization cards and documents reflecting the "showing of interest" investigation. Madeira also asked the court to restrain the Board from proceeding with a hearing until it complied with Madeira's request for discovery.
 
 
 7
 After hearing oral argument, the district court refused to issue a restraining order. It did, however, order briefs on the discoverability of the requested material under the Act.
 
 
 8
 Meanwhile, the Board conducted a regional representation hearing and on May 9, 1977, issued a Decision and Direction of Election. That election, at which Madeira employees rejected Union representation by a margin of 30 to 15, was held on June 10, 1977.
 
 
 9
 On May 26, 1977, the district court granted summary judgment to the Board and denied relief on Madeira's claim. Madeira appeals.
 
 
 10
 In its order the district court held that union authorization cards fall within Exemption 6 of U.S.C. § 552 and are, therefore, not discoverable. We approve that decision and affirm.
 
 
 11
 The district court's order did not directly address the questions raised by Madeira's claim to "any documents indicating the Region's final determination of the petitioner's showing of interest or lack thereof." Appellant's request is too general to permit interpretation here. As it stands, that request could encompass an assortment of Board records which might require diverse treatment under the Act. We can decide the applicability of the various Freedom of Information Act exemptions only in the context of specific individual documents.[1] The indeterminate scope of appellant's claim requires us to affirm the district court on this point as well.
 
 
 12
 Both the 3rd and 5th Circuits have held that union authorization cards are not discoverable under the Act. Pacific Molasses, supra, and Committee on Masonic Homes of the R. W. Grand Lodge, F. and A. M. of Pennsylvania v. NLRB, 556 F.2d 214 (3d Cir. 1977). Since the question is one of first impression in this Court, we offer a brief analysis of the general principles underlying our decision.
 
 
 13
 The Freedom of Information Act revised the public disclosure section of the Administrative Procedure Act, 5 U.S.C. § 1002. This change reflected a congressional intent to announce "a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." S.Rep.No.813, 89th Cong., 1st Sess. (1965). As Judge Bazelon of the United States Court of Appeals for the District of Columbia noted, "(T)he primary purpose of the Freedom of Information Act was to increase the citizen's access to government records." Bristol-Myers Co. v. Federal Trade Commission, 138 U.S.App.D.C. 22, 25, 424 F.2d 935, 938 (1970), cert. denied, 400 U.S. 824, 91 S.Ct. 46, 27 L.Ed.2d 52.
 
 
 14
 On the other hand, Congress recognized that unrestrained public access to any and all government records might have undesirable consequences. To permit disclosure of certain types of information could impair the effective performance of vital governmental functions and threaten the well-being of individual citizens by unnecessarily revealing information of a personal nature. S.Rep.No.813, 89th Cong., 1st Sess. (1965).
 
 
 15
 The Act attempts to balance these competing concerns by exempting nine categories of material from the general policy of disclosure.
 
 
 16
 We agree with the 3rd Circuit's determination that Exemption 6 of the Act controls the issue of employer access to union authorization cards. Masonic Homes, supra at 219-220. Exemption 6 covers "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." Union authorization cards cannot be characterized as "personnel or medical files;" however, we are convinced that these cards do fall within the meaning of "similar files" for purposes of Exemption 6. We decline to force on the phrase "similar files" the narrow, technical construction urged by appellant. Instead, we take the words to mean that the records in question must, like medical and personnel files, contain information of a personal or confidential nature. Wine Hobby U. S. C., Inc. v. IRS, 502 F.2d 133 (3rd Cir. 1974), supports this interpretation.
 
 
 17
 The central inquiry is whether public access to the information found in authorization cards is tantamount to an invasion of privacy; if so, we ask whether such an invasion is justified by any countervailing public benefit from disclosure.
 
 
 18
 When an employee signs an authorization card during the initial phase of union organization, he expresses a personal decision to seek the support of a union in future dealings with his employer. Since the union organization of a company may take the form of a protracted and bitter struggle over employee loyalties, an employee may be amply justified in wishing to protect his pro-union declaration from employer scrutiny.
 
 
 19
 We would be naive to disregard the abuse which could potentially occur if employers and other employees were armed with this information. The inevitable result of the availability of this information would be to chill the right of employees to express their favorable union sentiments. Such a chilling effect would undermine the rights guaranteed by the N.L.R.A., and, for all intents and purposes, would make meaningless those provisions . . . which guarantee secrecy in union elections.
 
 
 20
 Pacific Molasses, supra at 1182.
 
 
 21
 Appellant insists that an employee can have no expectation of confidentiality when he signs a card. This contention is apparently based on the fact that a union which holds authorizations from the majority of a bargaining unit may bypass the election process by submitting its authorization cards directly to the employer. Appellant's argument ignores an important distinction. An employee may reasonably feel less vulnerable after he knows his union is likely to prevail than at the outset of an organization campaign when the ultimate result remains uncertain. Indeed, it is in such a case as this one, where the defeated Union may be unable to give the support anticipated by its adherents, that employees who signed authorization cards could be most justified in seeking to preserve their anonymity.
 
 
 22
 The foregoing considerations compel a finding that employees have an important privacy interest in their personal attitudes toward union representation. Appellant has failed to convince us that this privacy interest is offset by any equally significant benefits to the public if this information were made available.
 
 
 23
 Accordingly, we hold that Exemption 6 of the Freedom of Information Act precludes an employer from obtaining signed union authorization cards or other Board documents which reveal the voting preferences of individual employees. The decision of the district court is affirmed.
 
 
 
 [1]
 Had appellant limited its claim to Form 4069 alone, for example, we could decide whether or not to grant disclosure in accordance with Pacific Molasses Company v. NLRB Regional Office # 15, 577 F.2d 1172 (5th Cir. 1978)