[Nos. B218286, B221436. Second Dist., Div. One. Oct. 29, 2010.]

PETER A. BURKE, Plaintiff and Respondent, v.
STEVEN J. IPSEN et al., Defendants and Appellants.

## COUNSEL

Monforton Law Offices and Matthew G. Monforton for Defendants and Appellants.

Katzenbach and Khtikian and Christopher W. Katzenbach for Plaintiff and Respondent.

## OPINION

**MALLANO, P. J.**—A member of a union filed a petition for a writ of mandate in the trial court, seeking to compel the union to conduct an election of officers and directors and to set aside the union's recently amended bylaws. The petition alleged violations of the Corporations Code and the union's original bylaws.

The union opposed the petition on the ground that plaintiff had failed to exhaust administrative remedies by not presenting his claims to the local employee relations commission.

The trial court concluded plaintiff did not have to exhaust administrative remedies because his claims involved internal union affairs, which the employee relations commission did not have the authority to resolve. The court granted the petition and issued a writ of mandate directing that an election be conducted and declaring the amended bylaws invalid. In subsequent proceedings, the court awarded attorney fees to plaintiff under the private attorney general statute, Code of Civil Procedure section 1021.5. The union appealed.

We agree with the trial court that plaintiff did not have to exhaust administrative remedies because the court was the proper tribunal to enforce

the Corporations Code and the union's original bylaws in a dispute involving internal union affairs. We also conclude that the trial court did not abuse its discretion in awarding attorney fees under a private attorney general theory.

# I

# BACKGROUND

The Association of Deputy District Attorneys (ADDA) is a nonprofit mutual benefit corporation that began as a social organization for Los Angeles County deputy district attorneys. Its original bylaws, enacted in 1998, reflected the ADDA's status as a social organization.

In March 2008, the Los Angeles County Employee Relations Commission (Commission) certified the ADDA as an employee organization to represent deputy district attorneys in grades I through IV employed by the Los Angeles County District Attorney's Office. The Commission operates under the authority of the employee relations ordinance of the county of Los Angeles (Ordinance), enacted in 1968. (See L.A. County Ord. No. 9646, codified at L.A. County Code, §§ 5.04.010–5.04.250.)

On October 8, 2008, the ADDA's board of directors submitted several proposed bylaw amendments to its members for approval. One amendment extended the terms of the existing officers and directors from one year to the earlier of either three years or 12 months after the approval of a new collective bargaining agreement. Another amendment allowed the board to increase membership dues without a vote of the members. Before the vote on the amendments, annual dues were $30 for all grade levels.

On October 18, 2008, the ADDA counted the ballots and announced that the amendments had been adopted. On October 21, the board canceled the upcoming election, allowing the existing officers and directors to remain in office after their one-year terms would have expired under the 1998 bylaws. The board also increased dues from $30 per year to $55 per month for grades I and II, and to $75 per month for grades III and IV.

On October 16, 2008, Peter A. Burke, a grade IV deputy district attorney and a member of the ADDA, filed a petition for a writ of mandate in the trial court, challenging the actions of the board. On December 5, 2008, Burke filed an amended petition (petition) against the board, the ADDA, and Steven J. Ipsen, the president of the board (collectively ADDA). The petition alleged that the ADDA's failure to hold annual elections and its adoption of the amended bylaws violated provisions of the Corporations Code and the 1998

bylaws. As relief, the petition sought to set aside the amended bylaws and to compel the ADDA to hold elections. The ADDA filed an answer to the petition.

On May 14, 2009, the ADDA filed a motion for judgment on the pleadings, contending Burke had failed to exhaust administrative remedies by not presenting his claims to the Commission. On the same day, the ADDA filed a "motion for judgment on peremptory writ," arguing Burke lacked standing to bring the petition because he was a "confidential" employee and was therefore prohibited from joining the ADDA. For his part, on May 26, 2009, Burke filed a notice of hearing on the petition, his supporting declaration, and a memorandum of points and authorities. The parties filed opposition and reply papers.

All matters were heard on June 17, 2009. The trial court provided the parties with a tentative ruling on each matter. After argument, the trial court adopted the tentative rulings as its final rulings, granting the petition and denying the ADDA's motions.

On July 24, 2009, the trial court filed a judgment granting the petition for a writ of mandate, directing the ADDA to (1) conduct an election of officers and directors forthwith in accordance with the procedures set forth in the 1998 bylaws, and, if compliance with the 1998 bylaws was not possible or feasible, then in accordance with alternative procedures resembling the 1998 procedures; (2) set aside the vote of October 2008 adopting the amended bylaws, treat the amended bylaws as having no force and effect, and conduct a new election for amended bylaws; and (3) file a return with the court under oath within 30 days indicating what had been done to comply with the writ. On August 14, 2009, the ADDA filed an appeal from the judgment (B218286).

On September 22, 2009, Burke filed a motion for attorney fees under the private attorney general statute, Code of Civil Procedure section 1021.5. That statute provides: "[A] court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. . . ." The ADDA filed opposition.

The motion was heard on November 19, 2009. By order of that date, the trial court awarded Burke $60,000 in attorney fees. On December 17, 2009, the ADDA appealed from the order (B221436).

On October 7, 2010, we consolidated the appeals for purposes of oral argument and decision.

## II

## DISCUSSION

The ADDA contends the judgment granting the petition must be reversed because Burke failed to exhaust administrative remedies. We review that issue de novo. (See *Citizens for Open Government v. City of Lodi* (2006) 144 Cal.App.4th 865, 873 [50 Cal.Rptr.3d 636].) The ADDA also argues the trial court erred in awarding attorney fees under Code of Civil Procedure section 1021.5. We review that alleged error for an abuse of discretion. (See *New West Charter Middle School v. Los Angeles Unified School Dist.* (2010) 187 Cal.App.4th 831, 848–849 [114 Cal.Rptr.3d 504].)

A. *Exhaustion of Administrative Remedies*

■ "[W]here a right is given and a remedy provided by statute, the remedy so provided must ordinarily be pursued." (*Rojo v. Kliger* (1990) 52 Cal.3d 65, 83 [276 Cal.Rptr. 130, 801 P.2d 373].) Thus, " 'where an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act.' " (*Id.* at p. 84.) But "this oft-quoted rule speaks only to the need to exhaust administrative remedies provided for a statutory right and does not govern rights and remedies outside the legislative scheme." (*Ibid.*)

■ Burke's petition for a writ of mandate relied on the rights conferred by the Corporations Code and the ADDA's 1998 bylaws. By statute, the superior court has jurisdiction over claims under the Corporations Code. (See Corp. Code, §§ 7510, subd. (c), 7616, subd. (a), 7520, subd (c).) Further, an action for breach of a union's bylaws may be brought in superior court as a claim for breach of contract. (See *CDF Firefighters v. Maldonado* (2008) 158 Cal.App.4th 1226, 1237–1238 [70 Cal.Rptr.3d 667]; see also *San Lorenzo Education Assn. v. Wilson* (1982) 32 Cal.3d 841, 853 [187 Cal.Rptr. 432, 654 P.2d 202] [union did not have to exhaust administrative remedies before filing civil action against its members for breach of collective bargaining agreement].)

Nevertheless, the ADDA contends that, before resorting to the courts, Burke had to present his claims to the Commission because he sought to enforce rights created by the Ordinance. The ADDA had the burden of proof on this issue. (See *Mokler v. County of Orange* (2007) 157 Cal.App.4th 121,

136–138 [68 Cal.Rptr.3d 568]; *Payne v. Anaheim Memorial Medical Center, Inc.* (2005) 130 Cal.App.4th 729, 742, fn. 8 [30 Cal.Rptr.3d 230].)

Under the codified version of the Ordinance, the Commission "investigate[s] charges of *unfair employee relations practices* . . . [and takes] such action as the commission deems necessary to effectuate the policies of [the Ordinance], including, but not limited to, the issuance of cease and desist orders." (L.A. County Code, § 5.04.160, subd. E, italics added.) *"Employees* of the county shall have the *right to* form, join and *participate* in the activities of employee organizations of their own choosing for the purpose of representation of all matters of employee relations." (*Id.*, § 5.04.070, italics added.) "It shall be an unfair employee relations practice for *employee organizations* or their representatives or members: [¶] . . . [t]o *interfere with, restrain* or coerce employees in the exercise of *the rights* recognized or granted in [the Ordinance] . . . ." (*Id.*, § 5.04.240, subd. B.1, italics added.) According to the ADDA, the writ petition actually accused it of having committed an unfair employee relations practice by interfering with or restraining Burke's right to participate in its activities (*id.*, §§ 5.04.070, 5.04.240, subd. B.1), and the Commission had the authority to investigate and resolve the dispute (*id.*, § 5.04.160, subd. E).

On the other hand, the Ordinance emphasizes that its purpose is to resolve disputes between an *employer* and its *employees*, not between groups of *employees*. The codified version of the Ordinance begins with the statement: "The board of supervisors of the county of Los Angeles declares that it is the public policy of the county and the purpose of the ordinance . . . to promote the improvement of personnel management and relations *between* the county of Los Angeles *and* its employees . . . ." (L.A. County Code, § 5.04.020, italics added.) The Ordinance defines "employee relations" as "the relationship between the county *and* its employees and their employee organizations, or when used in a general sense, the relationship between management *and* employees or employee organizations." (*Id.*, § 5.04.030, subd. H, italics added.) Given this tension in the purpose of the Commission—(1) its primary function to regulate employer-employee relations (*id.*, §§ 5.04.020, 5.04.030, subd. H), and (2) its obligation to resolve some disputes involving only employees (*id.*, §§ 5.04.070, 5.04.240, subd. B.1)—the courts must determine the scope of the Commission's authority to hear labor practice charges involving purely internal union affairs.

The Ordinance is a local employment regulation governed by the Meyers-Milias-Brown Act (MMBA) (Gov. Code, §§ 3500–3511; undesignated section references are to that code). (See *Los Angeles County Civil Service Com. v. Superior Court* (1978) 23 Cal.3d 55, 59–63 [151 Cal.Rptr. 547, 588 P.2d 249]; *Union of American Physicians & Dentists v. County of Los Angeles*

(1983) 144 Cal.App.3d 236, 239–242 [192 Cal.Rptr. 500].) The Commission's actions, determinations, and orders must be "consistent with and pursuant to the policies of [the MMBA]." (§ 3509, subd. (d).) "The MMBA has two stated purposes: (1) to promote full communication between public employers and employees; and (2) to improve personnel management and employer-employee relations within the various public agencies." (*People ex rel. Seal Beach Police Officers Assn. v. City of Seal Beach* (1984) 36 Cal.3d 591, 597 [205 Cal.Rptr. 794, 685 P.2d 1145].)

The Public Employment Relations Board (PERB) is vested with the authority to interpret the provisions of six different labor relations acts, including the MMBA. (See *Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.* (2005) 35 Cal.4th 1072, 1077 & fn. 1, 1084–1086 [29 Cal.Rptr.3d 234, 112 P.3d 623] (*Coachella Valley*).) The PERB is an independent state board consisting of five members appointed by the Governor with the advice and consent of the Senate. (§ 3541, subd. (a).) Although the PERB does not have jurisdiction over the Commission or the Ordinance (*Coachella Valley*, at p. 1077 & fn. 1), it has frequently construed statutory provisions similar to those at issue here. We therefore look to the PERB's decisions for guidance. (See *Regents of University of California v. Public Employment Relations Bd.* (1986) 41 Cal.3d 601, 617 [224 Cal.Rptr. 631, 715 P.2d 590].)[1]

In *Service Employees International Union, Local 99 (Kimmett)* (1979) PERB Decision No. 106 [3 PERC ¶ 10134] (*Kimmett*), a union member filed an unfair practice charge against his union, alleging it had held meetings when his unit could not attend, prevented him from examining a union financial report, failed to inform his unit of the status of negotiations for a new collective bargaining agreement, and appointed a new secretary-treasurer without the participation of his unit. The charge asserted the union had violated section 3543.6, subdivision (b) of the Educational Employment Relations Act (EERA) (§§ 3540–3549). That statute provides: "It shall be unlawful for an employee organization to: [¶] . . . [¶] . . . [i]mpose or threaten to impose reprisals on employees, to discriminate or threaten to discriminate against employees, or otherwise to interfere with, restrain, or coerce employees because of their exercise of rights guaranteed by this [act]." (§ 3543.6, subd. (b).)

The PERB rejected the union member's charge, explaining: "The EERA gives employees the right to 'join and participate in the activities of employee

---

[1] After the PERB issues its decisions individually, they are collected and bound in numbered volumes by the unofficial Public Employee Reporter for California (PERC). The individual decisions, in their original format, can be found at the PERB's Web site (<http://www.perb.ca.gov/decisionbank/search.aspx> [as of Oct. 29, 2010]).

organizations' (sec. 3543) and employee organizations are prevented from interfering with employees because of the exercise of their rights (sec. 3543.6(b)). Read broadly, these sections could be construed as prohibiting any employee organization conduct which would prevent or limit employees' participation in any of its activities. The internal organization structure could be scrutinized as could the conduct of elections for union officers to ensure conformance with an idealized participatory standard. However laudable such a result might be, the Board finds such intervention in union affairs to be beyond the legislative intent in enacting the EERA. There is nothing in the EERA comparable to the [federal] Labor-Management Reporting and Disclosure Act of 1959 [(29 U.S.C. §§ 401–531)] which regulates certain internal conduct of unions operating in the private sector. The EERA does not describe the internal workings or structure of employee organizations nor does it define the internal rights of organization members. We cannot believe that by the use of the phrase 'participate in the activities of employee organizations . . . for the purpose of representation on all matters of employer-employee relations' in section 3543, the Legislature intended this Board to create a regulatory set of standards governing the solely internal relationship between a union and its members. Rather, we believe that the Legislature intended in the EERA to grant and protect employees' rights to be represented in their employment relations by freely chosen employee organizations.

"Thus, unless the internal activities of an employee organization have such a substantial impact on employees' relationship with their employer as to give rise to a duty of fair representation, we find that public school employees do not have any protected rights under the EERA in the organization of their exclusive representative." (*Kimmett, supra*, PERB Dec. No. 106, pp. 15–17 [3 PERC ¶ 10134, pp. 422–423], fns. omitted.) A union's duty of fair representation arises from its status as the employees' *exclusive* agent in dealing with the employer and applies to the negotiation, administration, and enforcement of a collective bargaining agreement and to the union's representation of an employee in a grievance or arbitration proceeding. (See *Electrical Workers v. Foust* (1979) 442 U.S. 42, 46–47 & fn. 8 [60 L.Ed.2d 698, 99 S.Ct. 2121]; *Electrical Workers v. Hechler* (1987) 481 U.S. 851, 864 & fn. 6 [95 L.Ed.2d 791, 107 S.Ct. 2161].) "[U]nions owe a duty of fair representation to their members, and this requires them to refrain from representing their members arbitrarily, discriminatorily, or in bad faith." (*Hussey v. Operating Engineers Local Union No. 3* (1995) 35 Cal.App.4th 1213, 1219 [42 Cal.Rptr.2d 389].)

In *California State Employees Association (Hutchinson and Laosantos)* (1998) PERB Decision No. 1304-S [23 PERC ¶ 30028] (*Hutchinson and Laosantos*), two union members charged that their union had violated section 3519.5, subdivision (b) of the Government Code (Ralph C. Dills Act; §§ 3512–3524). That statute—like the comparable provision of the EERA (§ 3543.6, subd. (b))—provides: "It shall be unlawful for an employee

organization to: [¶] . . . [¶] . . . [i]mpose or threaten to impose reprisals on employees, to discriminate or threaten to discriminate against employees, or otherwise to interfere with, restrain, or coerce employees because of their exercise of rights guaranteed by this [act]." (§ 3519.5, subd. (b).)

In dismissing the unfair practice charge, the PERB stated: "Under the Dills Act, state employees have the right to participate in the activities of employee organizations for the purpose of representation on matters of employer-employee relations (Dills Act sec. 3515). However, the Board has not interpreted the Dills Act as protecting all participation in employee organization activities, or as providing PERB with unlimited authority to review the internal affairs of employee organizations. In [*Kimmett, supra*, PERB Decision No. 106 [3 PERC ¶ 10134]], the Board examined the identical right provided under the Educational Employment Relations Act (EERA) to determine if employees have any protected right 'to have an employee organization structured or operated in any particular way.' . . . Pursuant to [*Kimmett*], the statutes administered by PERB provide employees with no protected rights in the organization or operation of their exclusive representative unless the internal activities of the employee organization have a substantial impact on the employees' relationship with their employer. . . .

"In recent cases, the Board has reiterated that it will not intervene in matters involving the solely internal activities or relationships of an employee organization which do not impact employer-employee relations. . . . [I]n [*California State Employees Association (Garcia)*] (1993) PERB Decision No. 1014-S [17 PERC ¶ 24153], the Board dismissed charges relating to alleged union election irregularities and union discipline procedures because there was no showing of a substantial impact on the charging party's relationship with her employer.

"[Yet] the Board has intervened in the internal affairs of a union when alleged retaliation against members for their union participation went beyond solely internal union activities or relations and impacted the employment relationship. In other cases, the Board has reviewed internal union affairs to consider the reasonableness of a union's membership restrictions or dismissals.

"In [*California Union of Safety Employees (Coelho)*] (1994) PERB Decision No. 1032-S [18 PERC ¶ 25029], the Board found a violation in the union's retaliatory filing with the employer of a citizen's complaint against an employee, and in its subsequent refusal to represent the employee in the resulting investigation conducted by the employer. The union's conduct directly impacted the employee's relationship with his employer and was beyond the solely internal relationship of the employee and union. . . .

"These cases confirm that the Dills Act does not protect the solely internal union participation and activities of employees which do not impact employer-employee relations. However, the Board retains the authority to review internal union activities in order to examine allegations of retaliation against members for their union participation when the alleged misconduct impacts the employment relationship or employer-employee relations; or to assess the reasonableness of a union's membership restrictions." (*Hutchinson and Laosantos, supra*, PERB Dec. No. 1304-S, pp. 2–6 [23 PERC ¶ 30028, pp. 97–98], fns. omitted.)

"[I]n [*California State Employees Association (Hutchinson)*] (1999) PERB Decision No. 1369-S [24 PERC ¶ 31032], the Board [applied its analysis in *Kimmett, supra*, PERB Decision No. 106, pages 15–17 [3 PERC ¶ 10134, pp. 422–423]], and dismissed allegations that the union [had] conducted elections outside the timeframe required by internal union bylaws, mailed election ballots in violation of internal union bylaws, improperly validated ballots in violation of internal union bylaws, failed to properly distribute election results in violation of internal union bylaws and improperly installed union officers . . . ." (*Capistrano Unified Education Association (La Marca)* (2001) PERB Dec. No. 1457, pp. 4–5 [25 PERC ¶ 32106, p. 361].)

In *Service Employees International Union Local 1292 (Marriott et al.)* (2008) PERB Decision No. 1956-M [32 PERC ¶ 78] (*Marriott*), a "parent union," the Service Employees International Union (SEIU), was charged with violating section 3502 of the MMBA by consolidating several of its local unions into one local without permitting the charging party or her unit to vote on the matter. After the merger, the charging party's unit was represented by a local " 'hundreds of miles away,' " and the local indicated it would not represent the charging party's unit in disputes with management because of the distance. (*Marriott, supra*, PERB Dec. No. 1956-M, p. 4.)

In dismissing the unfair practice charge, the PERB said: "The MMBA confers on public employees the statutory right to be represented by employee organizations of their own choice. (MMBA secs. 3500 and 3502.) MMBA section 3502 provides in pertinent part that 'public employees shall have the right to form, join, and participate in the activities of employee organizations of their own choosing . . . .' (MMBA sec. 3502.) . . . [T]he MMBA 'provides strong protection for the right of employees to be represented by unions of their own choosing.' . . .

"MMBA section 3502 implicitly recognizes that employees may choose to join or participate in different organizations. It also confers upon each employee the right not to join or otherwise participate in the activities of any employee organizations. . . . [¶] . . . [¶]

"We hold that under the MMBA, a local union member may challenge the parent union's consolidation decision, but only when that decision has a substantial [effect] on the employer-employee relationship. We also hold that an employee may only challenge the parent union's failure to afford its members the opportunity to vote for or against a consolidation of local unions under the MMBA, if the employee can demonstrate that such consolidation had a substantial impact on the employer-employee relationship. We find that [the charging party] has not alleged facts showing that her relationship with [her employer] was substantially affected by either SEIU's merger of [her] local union with other locals or SEIU's alleged failure to allow [her] bargaining unit to vote on the merger." (*Marriott, supra*, PERB Dec. No. 1956-M, pp. 8–10. [32 PERC ¶ 78, p. 275].)

The PERB continued: "In [*Kimmett, supra*, PERB Decision No. 106 [3 PERC ¶ 10134]], the Board held that the rights afforded under EERA to freely choose one's employee organization (which are substantially similar to those under the MMBA) do not allow PERB to scrutinize either the union's structure or the conduct of elections for union officers unless a significant effect on the employee's relationship with its employer results. . . .

"In [*California School Employees Association & Its Chapter 36 (Peterson)* (2004) PERB Decision No. 1733] [29 PERC ¶ 50], the [PERB] held that 'Participation in union elections is an internal union affair.' In that case, the Board dismissed, among others, a charge that the union improperly denied an employee the opportunity to run for union office under its own constitution's election rules because no facts were alleged to support a finding that this conduct impacted the charging party's relationship with his employer." (*Marriott, supra*, PERB Dec. No. 1956-M, p. 16 [32 PERC ¶ 78, p. 277].)

More recently, in *California Faculty Association (Williams)* (2010) PERB Decision No. 2116-H [34 PERC ¶ 101], the board reiterated that "matters concerning internal union affairs are immune from review by PERB, unless they have a 'substantial impact' on the relationship of unit members to their employer so as to give rise to a duty of fair representation. . . . In numerous cases, the Board has refused to intervene where the alleged unlawful conduct involved internal union affairs and there was no showing of a substantial impact on the employee-employer relationship." (*Williams*, PERB Dec. No. 2116-H, p. 4 [34 PERC ¶ 101, p. 504], citation & fn. omitted.)

■ We find these PERB decisions persuasive. Notwithstanding the provisions in the Ordinance recognizing an employee's right to participate in union activities and making it an unfair practice for a union to interfere with that right, the Commission does not have authority over internal union affairs unless they have a substantial effect on the employer-employee relationship.

The PERB has repeatedly interpreted provisions of the EERA, the Ralph C. Dills Act, and the MMBA as imposing the same restriction on its own authority. That restriction is the result of statutory interpretation and is not, as the ADDA contends, a self-imposed limitation created by the PERB for its own convenience. Like the state's labor relations acts, the Ordinance "does not describe the internal workings or structure of employee organizations nor does it define the internal rights of organization members." (*Kimmett, supra,* PERB Dec. No. 106, p. 16 [3 PERC ¶ 10134, p. 423].) We therefore adopt the PERB's interpretation of state law in applying the virtually identical provisions of the Ordinance.

In determining whether Burke's claims involved a purely internal union matter, we examine the trial court's detailed analysis supporting the issuance of the writ of mandate. In its final ruling, the trial court explained: "Burke argues that the Bylaws amendments could not extend the terms of existing directors and the court should order that an election of directors take place that should have occurred in [2008]. He further argues that the amended bylaws were adopted through various procedural irregularities and must be set aside.

"California Corporations Code Section 7220(a) provides, in material part: 'No amendment of the articles or bylaws may extend the term of a director beyond that for which the director was elected, nor may any bylaw provision increasing the terms of directors be adopted without approval of the members.' . . .

"The 1998 Bylaws provided for the annual election of 21 directors. The election procedure for directors began each year on October 5 and was concluded on December 5. Burke contends that the ADDA breached Corp. Code section 7220(a) when it failed to complete the [2008] election.

"[The ADDA] argue[s] that Corp. Code section 7220(a) permits the extension of a Board member's term 'with the approval of the members.' [It is] wrong. Section 7220(a) quite clearly states that a sitting director's term may not be extended at all. . . . In other words, those directors in place may not have their terms extended, and bylaws can be amended to lengthen the terms of *future* directors . . . .

"By [statute], the ADDA could not extend the terms of sitting directors. The Amended Bylaws violated this law. . . . [¶] . . . [¶]

". . . The terms of the ADDA Board were extended unlawfully, and the remedy is to conduct the 2008 election in the manner most consistent with the procedures in effect at that time. That means an election under the 1998

Bylaws with deputies voting who were members in October 2008 or were eligible for membership by paying $30 dues for that year. [¶] . . . [¶]

"The vote on the Amended Bylaws was required to be 2/3 vote . . . . While Corp. Code section 7513(a) permits a vote by written ballot in lieu of a meeting, section 7513(b) provides in pertinent part that an '[a]pproval by written ballot . . . shall be valid only when . . . the number of approvals equals or exceeds the number of votes that would be required to approve at a meeting. . . .' Since Article XIII of the 1998 Bylaws provided for their amendment through a 2/3 vote at a membership meeting, the Amended Bylaws could be passed by written ballot only through a 2/3 vote.

"Corp. Code section 7333 prohibits discrimination between members in voting by requiring that 'all memberships shall have the same rights, privileges, preferences, restrictions, and conditions.'

"Burke alleges that the vote on the Amended Bylaws discriminated against members in voting because only deputies who were willing to pay the $55/75 per month dues were permitted to vote. Those willing to pay the existing 2008 annual dues of $30 were turned away. Burke contends that those willing to pay the new dues were more likely to vote for the Amended Bylaws, affecting the outcome of the vote. He notes that it is impossible to tell how the dues authorization ballots voted, and public policy in favor of fair corporate elections require the ADDA bear the burden of proving fairness when there is evidence of voter manipulation. He argues that the dues authorization ballots should be excluded as illegal . . . , and when that occurs there was less than a 2/3 of votes in favor of the Amended Bylaws.

"The ADDA violated public policy in favor of fair corporate elections in its ballot information. The ballot merely stated that as follows: 'You are eligible to VOTE if you: (1) signed the enclosed ADDA Membership and Dues Deduction Card, OR (2) are currently a member in good standing and eligible to vote under current ADDA bylaws. All [deputies] are encouraged to join or renew membership by signing the enclosed membership card and vote on this important issue.' Thus, deputies were informed that they could vote if they were a member in good standing, or if they signed up to pay the $50/75 per month dues. While deputies were encouraged to become a member and vote, they were not given the option of paying the 2008 $30 annual dues to do so. The only 'membership card' that was enclosed was the card authorizing the increased dues deduction.

"This notification plainly excluded deputies who were not members and who wanted to pay the $30 2008 fee in order to vote. The fact that the ADDA actually permitted deputies who submitted $30 with their ballot to vote does

not undermine this conclusion. Deputies were not informed of their option to do so, and it is not clear how many would have availed themselves of this right if so informed.

". . . [B]oth parties agree that the ADDA's longstanding practice was to permit deputies to join and vote at the same time.

"In short, the ballot procedure unfairly discriminated against deputies who were not ADDA members but who would have paid [the] $30 annual membership fee in order to vote on the proposed Amended Bylaws. It is impossible to discern what [effect] this discrimination had on the election. Burke's argument that the dues authorization ballots should have been excluded makes little sense. Those deputies who signed the dues deduction card were within the scope of those notified that their vote would count.

"Burke raises other claimed errors with the election procedure, both as violations of law and of the 1998 Bylaws.

"With respect to violations of law, Corp. Code section 7513 requires that the 'ballot shall . . . provide a reasonable time within which to return the ballot to the corporation.' Burke contends that the ballot did not provide a reasonable time within which to return the ballot. He argues that the 10-day window between October 8–18 was not enough time to address the many substantive changes in the Amended Bylaws because deputies are spread out in the County and communication between them for purposes of advocacy is difficult.

"This argument assumes that the reasonable period required by section 7513 is for members to caucus and campaign for or against the Amended Bylaws, as opposed to simply time to return the ballot by mail. Assuming that it is, the 10-day period was unreasonable. Members may be entitled to a membership list (Corp. Code § 8330), but that does not mean that an election must await a member's request for the list and effort to contact the existing members. Nonetheless, the scope of the Amended Bylaws required a greater period of evaluation by members before they were asked to vote. The 10-day period was unreasonable.

"Burke also contends that the ballot information did not indicate the number of responses necessary for a quorum and for approval. Corp. Code section 7513(c) provides that when ballots are solicited, the solicitation must indicate the number of votes needed for a quorum and for passage of the measure submitted.

"The ADDA solicitation contained no such information. This information is important because it gives the member an indication as to how important his

or her vote will be. For the ADDA, the number of votes for a quorum and for passage of the measure was impossible to provide because the ADDA would accept votes from deputies who were not members, but who were willing to sign up and vote at the same time. The ADDA would have no way of knowing ahead of time how many deputies would sign up and vote, and could not provide a 'number' for the quorum or for passage. It could, however, have informed the deputies that a quorum would be 20% (1998 Bylaws, Art. III, § 8) and that passage required a 2/3 vote.

"The ADDA acknowledges the violation, but argues that these were technical failures and Corp. Code section [7511](g) provides that '[a] court may find that notice not given in conformity with this section is still valid, if it is given in a fair and reasonable manner.' While the failure to provide the quorum information does not affect the fair and reasonable nature of the procedure, the failure to notify the members that a 2/3 vote was required does. This is not a technical failure.

"Article XIII of the 1998 Bylaws requires that the Board approve the election procedure, a copy of the proposed Amended Bylaws be issued to each member, and a change in the number of directors may not occur without a vote of the majority of actual members. In fact, the Board did not determine the election procedures, including the date, ballot information, and form of the ballot. This violated the 1998 Bylaws.

"The members did not receive a copy of the proposed Amended Bylaws either. The ADDA points out that the 1998 Bylaws only require that a copy of the proposed Amended Bylaws be 'issued' to each member, not delivered and received. The Board posted the proposed amendments online, and gave members a copy that could be picked up on election day at a Saturday seminar of deputies. It felt that this was sufficient given the ADDA's desire to reach all deputies and the prohibitive cost of doing so.

"The court agrees that this was a reasonable procedure consistent with the term 'issue,' and therefore did not violate the 1998 Bylaws. However, it did violate Corp. Code section 7513(a), which permits transmission of materials by email if the bylaws so permit and the board so approves and the recipient consents. (See Corp. Code § 20.) The 1998 Bylaws did not permit transmission by email, and posting on a website is not a transmission anyway. The ADDA should have transmitted the proposed Amended Bylaws to existing members, posting them on the website for any deputies who were not members but wanted to join. This failure violated Corp. Code section 7513(a).

"In sum, the ballot procedure unfairly discriminated against deputies who were not ADDA members but who would have paid [the] $30 annual

membership fee in order to vote on the proposed Amended Bylaws. The procedure also did not provide a sufficient period to evaluate the ballot, failed to notify members that a 20% quorum and 2/3 vote was required (the failure to notify the members of the quorum was not prejudicial), violated the 1998 Bylaws because the Board did not determine the election procedures, and violated Corp. Code section 7513(a) because the existing members did not receive a copy of the Proposed Bylaws. The Amended Bylaws must be set aside and a new election for them required. [¶] . . . [¶]

"The ADDA extended the terms of existing directors in violation of law. The remedy is to conduct the 2008 election in the manner most consistent with the procedures in effect at that time. That means an election under the 1998 Bylaws with deputies voting who were members in October 2008 or were eligible for membership by paying $30 dues for that year." (Fns. omitted, italics added.)

Thus, as made clear by the trial court's decision, Burke filed the petition based on violations of the Corporations Code and the ADDA's 1998 bylaws in an attempt to resolve purely internal union matters: the adoption of amended bylaws and the resulting cancellation of elections and an increase in dues. Those matters did not have a substantial effect on the employer-employee relationship. Rather, they involved procedural irregularities that occurred within the ADDA.

We cannot say the trial court would have benefitted from the Commission's alleged "expertise" in these circumstances. (See *Rojo v. Kliger, supra*, 52 Cal.3d at p. 83 [one purpose of administrative exhaustion is to maximize use of administrative agency's expertise].) Nor did Burke's claims involve ADDA conduct that was "arguably protected or prohibited" by the Ordinance. (*El Rancho Unified School Dist. v. National Education Assn.* (1983) 33 Cal.3d 946, 950, 953–957 [192 Cal.Rptr. 123, 663 P.2d 893].) The ADDA's actions were definitely prohibited by the Corporations Code and the 1998 bylaws. It follows that Burke did not have to present his claims to the Commission before seeking relief from the trial court.

The ADDA's reliance on our decision in *Anderson v. Los Angeles County Employee Relations Com.* (1991) 229 Cal.App.3d 817 [280 Cal.Rptr. 415] (*Anderson*) is misplaced. There, David Anderson, a member of the Professional Peace Officers Association (PPOA), became an organizer for a rival union, the Lieutenant and Sergeants Organization (LASO), which was formed to replace the PPOA as the bargaining representative. In accordance with its bylaws, the PPOA board of directors terminated Anderson's membership for engaging in " 'acts inimical to the welfare of [the PPOA].' " (*Id.* at p. 821.) Anderson did not contest his expulsion but continued his efforts to replace the

PPOA with the LASO. Eventually, a decertification election was held, the PPOA prevailed, and the LASO voted to dissolve. Soon thereafter, Anderson applied to be reinstated as a member of the PPOA. The board voted unanimously to deny his application.

Anderson filed an unfair practice charge with the Commission, alleging the PPOA had interfered with his right under the Ordinance to participate in the activities of the employee organization of his choice. (See L.A. County Code, §§ 5.04.070, 5.04.240, subd. B.1.) An administrative hearing officer found in favor of the PPOA. The Commission adopted the hearing officer's recommendation and dismissed the unfair practice charge. Anderson filed a petition for a writ of administrative mandate seeking to set aside the Commission's decision and to be reinstated as a member of the PPOA with full membership rights.

The trial court denied the petition, and Anderson appealed. We affirmed, stating: "Although the MMBA was designed to protect public employees in the exercise of their rights under the act, the MMBA also provides that '[e]mployee organizations may establish reasonable restrictions regarding who may join and may make reasonable provisions for the dismissal of individuals from membership . . . .' (Gov. Code, § 3503.) [¶] . . . [¶] . . . [Anderson's] expulsion was clearly justified by his efforts to organize a rival union and to decertify PPOA, which are certainly acts inimical to the welfare of PPOA in violation of . . . PPOA's bylaws." (*Anderson, supra,* 229 Cal.App.3d at pp. 825–826.) " 'An organization has the natural right of self preservation, and may with propriety expel members who show their disloyalty by joining a rival organization. . . .' . . .

"There is no question concerning the propriety of the procedures followed by PPOA in this case. When a disloyal member is expelled for his considerable efforts to form a rival union and later becomes its president and urges his fellow workers to vote to decertify the union in favor of his rival union, and then applies for readmission only four months after the unsuccessful decertification election and only days after disbanding the rival union, the denial of his reinstatement application by a unanimous vote of the board of directors is entirely reasonable. . . . In the ' "treason" cases in which an individual's acts are patently antagonistic to the continued existence of the union as a collective bargaining agent[,] . . . [t]he courts lose no time in such cases upholding union discipline.' " (*Anderson, supra,* 229 Cal.App.3d at p. 826, citation omitted.)

The ADDA relies on *Anderson* for the proposition that in this case, Burke had to submit his claims to the Commission before resorting to the courts. But in *Anderson,* the expelled union member voluntarily presented his

claims to the Commission, and, consequently, there was no question as to whether any "administrative remedies" even existed, much less whether they had to be exhausted. Indeed, there was no discussion of the exhaustion doctrine at all. " ' "It is axiomatic that cases are not authority for propositions not considered." ' " (*Silverbrand v. County of Los Angeles* (2009) 46 Cal.4th 106, 127 [92 Cal.Rptr.3d 595, 205 P.3d 1047].) Nor did *Anderson* rest primarily on an interpretation of the Corporations Code.

In addition, the PERB has interpreted the state's labor laws as granting it authority over disputes involving a union's membership rules and the procedures used for suspending members. (See *California State Employees Association (Hard et al.)* (2002) PERB Dec. No. 1479-S, pp. 14–17 [26 PERC ¶ 33065, p. 212].) The PERB "has reviewed internal union affairs to consider the reasonableness of a union's membership restrictions or dismissals." (*Hutchinson and Laosantos, supra*, PERB Dec. No. 1304-S, p. 5 [23 PERC ¶ 30028, p. 98].)

The ADDA analogizes the expulsion of a union member, as in *Anderson*, to its increase in dues under the amended bylaws, contending that the increase prevented some deputy district attorneys from joining the organization. This analogy fails. Burke did not claim that the dues increase precluded potential members from joining the union or forced existing members to leave. Rather, he claimed that the dues increase, like the cancellation of the pending election, was accomplished through an unlawful amendment of the bylaws. The writ petition challenged the *procedure* used to amend the bylaws, not a de facto expulsion of ADDA members. Common sense dictates that an increase in dues is not sufficiently similar to the expulsion of a union member to warrant that they be treated alike under labor relations laws. Simply put, in this case, the Ordinance did not regulate the bylaw amendments, the scheduling of union elections, or the dues increase, all of which were solely internal union affairs that did not substantially affect the employer-employee relationship.

■ Further, the ADDA argues that the analysis of the exhaustion issue is governed by the factors set forth in *Coachella Valley, supra*, 35 Cal.4th at pages 1081–1082. But *Coachella Valley* concerned an "exception" to the exhaustion doctrine (*id.* at p. 1081), namely, "[when] exhaustion . . . may be *excused*" (*ibid.*, italics added). As the Supreme Court stated: "Under another *exception*, exhaustion of administrative remedies may be *excused* when a party claims that 'the agency lacks authority, statutory or otherwise, to resolve the underlying dispute between the parties.' " (*Id.* at pp. 1081–1082, italics added; accord, *Edgren v. Regents of University of California* (1984) 158 Cal.App.3d 515, 520–521 [205 Cal.Rptr. 6] [discussing exceptions to administrative exhaustion]; *County of Alpine v. County of Tuolumne* (1958) 49 Cal.2d 787, 798 [322 P.2d 449] [exhaustion necessary where agency must

decide issue in first instance].) For example, the exception in *Coachella Valley* applies where an agency's enabling statute is ambiguous as to whether the agency has authority to hear the parties' dispute and where exhaustion might avoid judicial resolution of a constitutional issue. (See *Public Employment Relations Bd. v. Superior Court* (1993) 13 Cal.App.4th 1816, 1819, 1830 [17 Cal.Rptr.2d 323].) But the *Coachella Valley* exception is "inapplicable where, as here, the agency is given no jurisdiction to make a judicial determination of the type involved." (*County of Alpine*, at p. 798; accord, *Public Employment Relations Bd.*, at p. 1829.) We have concluded the Ordinance is not ambiguous: It does not encompass the internal union affairs at issue here. There are no special circumstances making the *Coachella Valley* exception applicable.

Assuming for the sake of argument that *Coachella Valley*'s factors apply, exhaustion was not required because (1) a judicial remedy—as opposed to initial proceedings before the Commission followed by judicial review—was an immediate necessity given that the ADDA was operating day to day with an unlawfully constituted board of directors; (2) under the Ordinance, the Commission definitely lacked authority over the internal union affairs raised in the writ petition; and (3) the Commission had no expertise in applying the Corporations Code to determine whether the amended bylaws were properly adopted. (See *Coachella Valley, supra*, 35 Cal.4th at pp. 1081–1083.)

Last, the ADDA points to language in the MMBA that the Commission "shall have the power and responsibility to take actions on recognition, unit determinations, *elections*, and all unfair practices" (§ 3509, subd. (d), italics added), contending that "elections" includes the election of union officers and directors. Not so. The MMBA is concerned with *representation* and *union shop* elections—with whether and how employees want to be organized and represented—not with a union's amendment of its bylaws or the election of its leaders. (See §§ 3502.5, subd. (b), 3507.1; compare § 3509, subd. (a) with § 3541.3, subd. (c).) Nothing in the Ordinance suggests that union elections are subject to the Commission's authority. As the PERB has recognized, voting on internal union affairs is not within the scope of the state's labor relations laws, including the MMBA. (See *Kimmett, supra*, PERB Dec. No. 106, pp. 15–17 [3 PERC ¶ 10134, pp. 422–423]; *California State Employees Association (Hutchinson), supra*, PERB Decision No. 1369-S, pp. 2–4 [24 PERC ¶ 31032, pp. 275–277]; *Marriott, supra*, PERB Dec. No. 1956-M, pp. 8–10, 16 [32 PERC ¶ 78, pp. 275–277]; *California State Employees Association (Garcia), supra*, PERB Dec. No. 1014-S, pp. 5–6 [17 PERC ¶ 24153, p. 465].) In short, " '[p]articipation in union elections is an internal union affair.' " (*Marriott, supra*, PERB Dec. No. 1956-M, p. 16 [32 PERC ¶ 78, p. 277].) It is outside the scope of the Commission's authority.

Accordingly, we reject the ADDA's contention that Burke had to exhaust administrative remedies.

## B. *Burke's Status as a Confidential Employee*

The ADDA contends that because Burke was a "confidential employee" within the meaning of the Ordinance, he could not join the organization and therefore had no standing to file the writ petition. Of course, this contention ignores the trial court's finding that Burke had paid the annual $30 dues prior to the 2008 vote amending the bylaws. The ADDA also asserts the trial court made inconsistent findings as to whether Burke was a confidential employee. Under the codified version of the Ordinance, a "confidential employee" is "an employee who is privy to decisions of county management affecting employee relations." (L.A. County Code, § 5.04.030, subd. C.)

Whether Burke was a confidential employee is of no consequence. The Ordinance prohibits confidential employees from being in the same *bargaining unit* as nonconfidential employees. (See L.A. County Code, § 5.04.200, subd. C.3.) It did not prohibit Burke from being a member of the *union* regardless of his job classification. (See *id.*, § 5.04.200, subd. C.) He therefore had standing to file the petition as a member of the ADDA.

## C. *Award of Attorney Fees*

"[T]he Legislature adopted [Code of Civil Procedure] section 1021.5 as a codification of the 'private attorney general' attorney fee doctrine that had been developed in numerous prior judicial decisions. . . . The doctrine rests upon the recognition that privately initiated lawsuits are often essential to the effectuation of the fundamental public policies embodied in constitutional or statutory provisions, and that, without some mechanism authorizing the award of attorney fees, private actions to enforce such important public policies will as a practical matter frequently be infeasible." (*Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 933 [154 Cal.Rptr. 503, 593 P.2d 200].)

In determining whether to award attorney fees under Code of Civil Procedure section 1021.5, a trial court "must consider whether: (1) plaintiffs' action 'has resulted in the enforcement of an important right affecting the public interest,' (2) 'a significant benefit, whether pecuniary or nonpecuniary has been conferred on the general public or a large class of persons' and (3) 'the necessity and financial burden of private enforcement are such as to make the award appropriate.' " (*Woodland Hills Residents Assn., Inc. v. City Council, supra*, 23 Cal.3d at p. 935.) We conclude the trial court did not err in finding that all three factors were satisfied.

 As to the first two factors, "[f]air and reasonable election procedures are fundamental to the proper governance of not only 'for profit' corporations but 'nonprofit' corporations, including labor unions. The members of such bodies should have a reasonable opportunity to be nominated and elected to the board of such an entity. These rights are important rights affecting the public interest." (*Braude v. Automobile Club of Southern Cal.* (1986) 178 Cal.App.3d 994, 1012 [223 Cal.Rptr. 914].) "A modern labor union, both in structure and in function, bears little resemblance to other voluntary associations. . . . Unions can be distinguished from other voluntary organizations in many respects. Most importantly, a large part of [a union's] power and authority is derived from [the] government[,] which makes it [the employees'] exclusive bargaining agent. . . . The union's power, when considered together with its source, imposes upon it reciprocal responsibilities toward its membership *and the public generally* that other voluntary organizations do not bear." (*Mitchell v. Internat. Assn. of Machinists* (1961) 196 Cal.App.2d 796, 799 [16 Cal.Rptr. 813], italics added, citation omitted.) Because "industrial democracy is important to the community," there is an "interest of the community and the individual in the [union's] membership." (*Id.* at p. 804.) Here, the relief granted by the trial court will directly affect almost 1,000 actual or potential members of the ADDA. (See *Estrada v. FedEx Ground Package System, Inc.* (2007) 154 Cal.App.4th 1, 16–17 [64 Cal.Rptr.3d 327] [plaintiff's success in obtaining relief for 209 employees satisfied "large class of persons" factor].)

 With respect to the third factor, " ' "[a]n award on the 'private attorney general' theory is appropriate when the cost of the claimant's legal victory transcends his personal interest, that is, when the necessity for pursuing the lawsuit placed a burden on the plaintiff 'out of proportion to his individual stake in the matter.' . . ." ' " (*Adoption of Joshua S.* (2008) 42 Cal.4th 945, 952 [70 Cal.Rptr.3d 372, 174 P.3d 192].) In this case, Burke bore the expense of bringing the petition, and there was no monetary award to offset the attorney fees he incurred. Burke's interest in the litigation was no greater than that of other nonofficers and nondirectors who wanted the ADDA to comply with the law. It would be inequitable for him to pay for litigation that resulted in an outcome of equal benefit to all ADDA members.

On appeal, the ADDA does not dispute that Burke satisfied the three factors under Code of Civil Procedure section 1021.5. It does not even discuss them. Instead, the ADDA contends that the benefits of the litigation were outweighed by the harm Burke caused when he filed an exhibit listing the names of the deputy district attorneys who had signed union authorization cards. Burke used the list to support the allegations in the petition that 950 deputy district attorneys were eligible for ADDA membership. The ADDA asserts that Burke thereby violated the privacy rights of the listed employees, diminishing the benefits achieved by the litigation. (See *Maderia Nursing,*

*etc. v. N.L.R.B., Region No. 9* (6th Cir. 1980) 615 F.2d 728, 730–731 [employees have important privacy interest in their personal attitudes toward union representation].) But the ADDA ignores that the *Commission* gave Burke the list as part of a *public* file it maintained on the ADDA's certification as a union, and Burke did not know the list should have been kept confidential. When the Commission's mistake was discovered, the parties sealed the exhibit, and Burke agreed to substitute a redacted version in the court file, not to distribute the list any further, and to retrieve the copies of the petition that included the list. The ADDA acknowledged that the disclosure was inadvertent and that Burke's representations to remedy the situation were "acceptable." Thus, the Commission's disclosure of the names as part of a public file, and Burke's use of it, did not affect his entitlement to attorney fees under section 1021.5.

The ADDA also seeks to overturn the award of attorney fees on the ground that the litigation undermined the ADDA's bargaining position with the county. This contention is based on the theory that (1) the writ petition questioned the authority of the ADDA's officers and directors to hold office under the amended bylaws, and (2) Burke should have presented his claims to the Commission instead of airing them in "open court." If, in fact, the ADDA's negotiating power was compromised, the union has only itself to blame. As the trial court correctly ruled, the officers and directors had unlawfully remained in office, and Burke did not have to exhaust administrative remedies. Burke's entitlement to attorney fees should not be denied on the ground that the ADDA's wrongful conduct, and the litigation Burke undertook to correct it, tarnished the ADDA's reputation.

Finally, Burke's request for appellate attorney fees should be presented to the trial court on remand. (See Cal. Rules of Court, rule 3.1702(a), (c).)

D. *Burke's Motion for Sanctions*

■ We deny Burke's motion to impose sanctions for a frivolous appeal. "[A]n appeal should be held to be frivolous only when it is prosecuted for an improper motive—to harass the respondent or delay the effect of an adverse judgment—or when it indisputably has no merit—when any reasonable attorney would agree that the appeal is totally and completely without merit." (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650 [183 Cal.Rptr. 508, 646 P.2d 179].) Applying that standard, we cannot say the appeal is frivolous.

## III

## DISPOSITION

The judgment granting the petition for a writ of mandate and the order awarding attorney fees to respondent Peter A. Burke are affirmed. Respondent Peter A. Burke is entitled to costs on appeal.

Rothschild, J., and Chaney, J., concurred.